1    Dean T. Kirby, Jr.     (Calif. Bar No.  090114)
     Roberta S. Robinson  (Calif. Bar No.  099035)
2    KIRBY & McGUINN, A P.C.
     707 Broadway, Suite 1750
3    San Diego, California 92101
     Telephone: (619) 685-4000
4    Facsimile:   (619) 685-4004

5    Michelle L. Abrams (Nev. Bar No. 5565)
     Michelle L. Abrams Ltd.
6    Abrams Probate & Planning Group
     530 South Fourth Street
7    Las Vegas, Nevada 89101
     Telephone:  (702) 369-3724
8    Facsimile:   (702) 369-0651

9    Attorneys for Third Party Defendants and
     Counterclaimants and Fourth Party Plaintiffs
10   DACA-Castaic, LLC and Debt Acquisition
     Company of America V, LLC

11                    UNITED STATES DISTRICT COURT

12                         DISTRICT OF NEVADA

13
     THE RICHARD AND SHEILA J.            Case No. 2:10-cv-01617-RCJ
14   McKNIGHT 2000 FAMILY TRUST,
     Richard McKnight, Trustee            MEMORANDUM OF POINTS AND
15                                        AUTHORITIES IN SUPPORT OF
                                          MOTION OF DACA-CASTAIC, LLC AND
16            Plaintiff                   DEBT ACQUISITION COMPANY OF
                                          AMERICA V, LLC FOR:
17       v.

18   WILLIAM J. BARKETT, an individual,  1)   DEFAULT JUDGMENT ON DACA'S
     CASTAIC III PARTNERS, LLC                 COUNTERCLAIM;
19   a California limited liability company
                                          2)   SUMMARY JUDGMENT ON DACA'S
20            Defendants                       SUPPLEMENTAL AND FOURTH
                                               PARTY COMPLAINTS; AND
21
                                          3)   SUMMARY JUDGMENT DENYING
22   AND RELATED INTERVENOR ACTIONS,           RELIEF ON THE THIRD PARTY
     THIRD PARTY ACTIONS AND                   COMPLAINT AND COUNTERCLAIM
23   COUNTERCLAIMS                             OF WILLIAM BARKETT. et al.

24

25

26

27

28

                                    1

# TABLE OF CONTENTS

Page

I. INTRODUCTION, SUMMARY OF THE CASE AND STATEMENT OF FACTS ........1

    A. THE ORIGINAL McKNIGHT ACTION................................................1

    B. CHALLENGES FACED BY THE DIRECT LENDERS:
       PLUMMETING VALUE, DELINQUENT TAXES AND LITIGATION .............1

    C. CROSS APPOINTED AS THE DIRECT LENDERS' REPRESENTATIVE .......2

    D. THE PURCHASE AGREEMENT AND ASSIGNMENT
       BY CROSS TO DACA...............................................................2

    E. DACA BECOMES A PARTY TO THE MCKNIGHT ACTION
       AND OBTAINS SUMMARY ADJUDICATION RULINGS..............................3

    F. DACA COMPLETES THE FORECLOSURES AND PAYS THE TAXES..........4

    G. DACA'S SUPPLEMENTAL COUNTERCLAIM
       AND FOURTH PARTY COMPLAINT ..................................................5

    H. DEFAULT IS ENTERED AGAINST THE BARKETT PARTIES .......................5

    I. DACA REPEATS THE FORECLOSURE SALES ...................................7

    J. THIS MOTION SEEKS FINAL JUDGMENT ON
       ALL CLAIMS TO WHICH DACA IS A PARTY...................................7

II. REQUEST FOR ENTRY OF DEFAULT JUDGMENT
    ON DACA'S COUNTERCLAIM ......................................................9

    A. ISSUES ALREADY SUMMARILY ADJUICATED.........................................9

        1. Enforceability of the Notes.....................................9

        2. Enforceability of the Trust Deeds.............................10

        3. Validity of the Purchase Agreement........................10

        4. Validity of the Pending Foreclosures........................11

    B. REQUEST TO RECONSIDER OR CLARIFY RULING ON THE
       EFFECT OF THE ASSIGNMENT OF THE CASTAIC TRUST DEEDS
       BY CROSS .............................................................................11

        1. The 3/14/12 Ruling on the Effect of the Assignments Appears
          Appears Inconsistent With Prior and Subsequent Orders
          Approving Note Sales Based on the 51% Rule .........................12

        2. Note Sales Are Authorized Under the 51% Rule ....................14

        3. DACA Acknowledges a Continuing Fiduciary Duty
          To All Castaic Direct Lenders ..................................17

i

C.      THE GUARANTIES  .......................................................................18

D.      AMOUNT OWING UNDER THE CASTAIC NOTES.......................................19

III.    SUMMARY JUDGMENT ON DACA'S SUPPLEMENTAL COUNTERCLAIM AND FOURTH PARTY COMPLAINT ...........................................................20

A.      THE VALIDITY OF THE FORECLOSURES ....................................................20

     1.      The November, 2012 Foreclosure Sales Were Valid ................................21

     2.      No Majority Action Affidavit Was Required Or If Required the Defect Was Cured. .........................................22

B.      NO RIGHT TO SET ASIDE THE FORECLOSURES.......................................24

C.      THE BARKETT PARTIES DO NOT HOLD ANY DIRECT LENDER INTERESTS .........................................................26

IV.    SUMMARY JUDGMENT ON THE BARKETT PARTIES' CLAIMS.........................28

V.     CONCLUSION..................................................................................29

1

## TABLE OF AUTHORITIES

2

Page(s)

3

CASES

4

*Anderson v Heart Federal Savings & Loan Assn.,*
   208 Cal App 3d 202-209-10, 256 Cal.Rptr. 180 (1989) .........................................25

5

*Arnolds Management Corp. v. Eischen,*
6   158 Cal.App.3d 575, 205 Cal.Rptr. 15 (1984).......................................................26

7   *Homestead Savings v. Darmiento,*
   230 Cal.App.3d, 424, 281 Cal.Rptr. 367 (1991).....................................................21
8

9   *Karlsen v. Am. Sav. & Loan Assn.,*
   15 Cal. App. 3d 112, 92 Cal. Rptr. 851 (1971)......................................................26

10
   *Lona v. Citibank, N.A.,*
11   202 Cal. App. 4th 89, 134 Cal. Rptr. 3d 622 (2011) .............................................26

12   *MCA, Inc . v. Universal Diversified Enterprises Corp.,*
   27 Cal.App.3d 170, 103 Cal.Rptr. 522 (1972)........................................................26
13

14   *Moeller v. Lien,*
   25 Cal. App. 4th 822, 30 Cal. Rptr. 2d 777 (1994) ...............................................21

15
   *Stevens v. Plumas Eureka Annex Mining Co.,*
16   2 Cal.2d 493, 41 P.2d 927 (1935) ........................................................................21

17   *Wolfe v. Lipsy,*
   163 Cal.App.3d 633, 209 Cal.Rptr. 801 (1985).....................................................21
18

19   STATUTES

20   Calif. Civ. Code §2924, subd. (c) ..........................................................................21

21   Calif. Civ. Code §2924d subd. (d) .........................................................................22

22   Calif. Civ. Code §2924f ...................................................................................22, 24

23   Calif. Civ. Code §2941.9 .................................................................................23, 24

24   Nev. Rev. Stat. §645B.340 ...............................................12, 14, 15, 16, 23, 24

25

26

27

28

I.      INTRODUCTION, SUMMARY OF THE CASE AND STATEMENT OF FACTS

         A.      THE ORIGINAL McKNIGHT ACTION

         The above-captioned lawsuit (the "McKnight Action") relates to a bankruptcy case, *In re Asset Resolution, LLC,* Case No., 09-32824-RCJ which is pending in this Court after withdrawal of the reference.  The McKnight Action originated as a lawsuit by Richard and Sheila McKnight (as Trustees of their family trust) relating to their investment in one of three related loans originated by USA Commercial Mortgage Company ("USACM"), and later serviced by Asset Resolution, LLC. Both USACM and Asset Resolution filed bankruptcy petitions, and the Asset Resolution bankruptcy case is pending in this Court as Case No. 09-32824-RCJ after withdrawal of the reference.

         These loans have been referred to in related bankruptcy proceedings pending in this Court as: "Castaic I" (or "Tapia Ranch"), "Castaic II" and "Castaic III" (the "Castaic Loans").  The borrowers as to the Castaic Loans were, respectively, Castaic Partners, LLC, Castaic Partners II, LLC, and Castaic Partners III, LLC (the "Borrowers").  Each of the Borrowers are controlled by William J. Barkett ("Barkett"), who is their managing member.  Barkett personally guaranteed each of the Castaic Loans.  The Borrowers and Barkett are referred to herein as the "Barkett Parties."

         Shortly after the McKnight Action was commenced, a large group of investors who held an interest in one or more of the Castaic Loans (referred to as the "Direct Lenders"), moved to intervene in the case.  The Barkett Parties objected on jurisdictional grounds.  These objections were overruled by the Court, and intervention was permitted, in an Order entered July 26, 2011 (D.I. 48). At that point, the Barkett Parties and all of the Direct Lenders became parties to the McKnight Action.

         B.      CHALLENGES FACED BY THE DIRECT LENDERS:
                 PLUMMETING VALUE, DELINQUENT TAXES AND LITIGATION

         The Castaic Direct Lenders were faced with substantial challenges if they were to obtain any recovery on account of their loan.  The collateral for the three Castaic Loans consisted of three contiguous tracts of raw land in Los Angeles County that were about to be down-zoned for purposes of development. (Justus Decl. ¶ 16.3 p. 5)   The value of all undeveloped land in California was in free-fall for several years after 2006.  The Barkett Parties had allowed real property taxes to become

1

1   more than five years delinquent.  (Justus Decl. ¶ 16.1 p. 4)  DACA obtained an MAI appraisal of the

2   properties, indicating that they had a total value of $5,095,000.00.  (Wasbin Decl fld. 1/6/12, p. 2 ll.

3   15-17)  The three Castaic  properties were later re-assessed by the County of Los Angeles as

4   follows:  (i) Tapia Ranch, $9,342,200; (ii) Castaic II $1,360,000; and (iii) Castaic III 2,340,000..

5   (Justus Decl. ¶ 16.1 pp. 4-5)

6        In addition to these daunting facts, the Castaic Loans presented another serious challenge.

7   Although the Castaic Properties themselves were now hugely overencumbered by real property taxes

8   and by the loans themselves, the Barkett Parties aggressively pursued litigation to defend against

9   foreclosure of the Castaic Trust Deeds.[1]  The earliest gambit came in January, 2010, when the

10  Barkett Parties (ignoring the choice of forum provisions in the loan documents) filed a lawsuit in

11  Los Angeles County Superior Court against all of the Castaic Direct Lenders.  Those Direct Lenders

12  residing outside California were purportedly served by certified mail, and about 150 defaults were

13  taken.  That lawsuit was ultimately stayed by the Los Angeles Superior Court pending the outcome

14  of the McKnight Action.  (Justus Decl. ¶16.4, p. 5)

15        C.        CROSS APPOINTED AS THE DIRECT LENDERS' REPRESENTATIVE

16        In the spring of 2010, after being sued by the Barkett Parties, the Castaic Direct Lenders

17  conducted a vote to appoint Cross FLS, LLC as representative to act on behalf of all beneficiaries

18  under the provisions of NRS 645B.340 (which includes what the parties in this action have referred

19  to as the "51% Rule").  That statute provides in part that:  "the holders of 51 percent or more of the

20  outstanding principal balance may act on behalf of all the holders of the beneficial interests of record

21  on matters which require the action of the holders of the beneficial interests in the loan."  The

22  appointment of Cross was confirmed by order of this Court entered June 8, 2010 as D.I. 913 in the

23  *Asset Resolution* bankruptcy case.

24        D.        THE PURCHASE AGREEMENT AND ASSIGNMENT BY CROSS TO DACA

25        In early 2011, while the McKnight Action was pending, Cross entered into negotiations with

26  DACA V, aimed at creating a joint venture to enforce the Castaic Loans.  Pursuant to a majority vote

27

28

---

[1]   Before the foreclosures were ultimately completed, the Barkett Parties and their affiliates had
      filed four different chapter 11 bankruptcy petitions and three new lawsuits in the California
      courts in an unsuccessful  effort to obtain a temporary restraining order.

2

1  of the Direct Lenders, Cross entered into an "Agreement to Purchase Loan Interests" (the "Purchase

2  Agreement", Exh 40) with DACA V and DACA-Castaic, LLC, a newly formed joint venture entity.

3  (Justus Decl. ¶ 16 p. 4 ll. 18-20; ¶ 17 ll. 4-6)  The members of DACA-Castaic, LLC, are DACA and

4  Castaic Investors, LLC, a Utah limited liability company formed by the Direct Lenders.  Castaic

5  Investors LLC was formed to hold and distribute in trust to all Castaic Direct Lenders (whether or

6  not they are members of Castaic Investors), a share of the profits to be obtained following

7  foreclosure and resale of the Castaic Properties.  Under the Loan Purchase Agreement, the Castaic

8  Trust Deeds were assigned of record by Cross to DACA-Castaic, LLC, and the original promissory

9  notes as to each loan were endorsed and delivered to DACA-Castaic, LLC.  (Justus Decl. ¶ 18-18.3,

10  p. 6, ll. 17-24).

11
        E.      DACA BECOMES A PARTY TO THE MCKNIGHT ACTION
12              AND OBTAINS SUMMARY ADJUDICATION RULINGS

13          DACA then moved to intervene in the McKnight Action, but on August 30, 2011 while that

14  motion was pending the Barkett Parties filed a "Cross-Claim"[2] in the McKnight Action (D.I. 90)

15  against DACA and against all of the Direct Lenders and Compass, a former loan servicer.  Having

16  been impleaded into the McKnight Action by the Barkett Parties, DACA withdrew the motion to

17  intervene and instead filed an answer to the "Cross Claim" (D.I. 75) together with a counterclaim

18  against the Barkett Parties (D.I. 76) seeking declaratory relief on a number of points.

19          In the meantime, DACA also filed a motion for summary judgment or, in the alternative,

20  summary adjudication of issues, seeking among other things a determination that the Purchase

21  Agreement was valid under the 51% Rule, and that DACA-Castaic was authorized to complete a

22  pending foreclosure of the Castaic Trust Deeds.  On March 14, 2012, the Court issued a

23  memorandum decision (the "3/14/12 Order" D.I. 170) granting DACA's motion in part, and denying

24  it in part.  The issues were, for the most part, adjudicated in favor of DACA.

25  / / /

26  / / /

27
_____
28  [2]  As directed by this Court, the Barkett Parties Cross-Claim was later re-filed without substantive
        changes, but titled and pleaded as a counterclaim and third party complaint (D.I. 157).

3

1    F.    DACA COMPLETES THE FORECLOSURES AND PAYS THE TAXES

2        Following the entry of the March 14, 2012 Order, DACA took steps to complete the pending

3    foreclosures of the Tapia Ranch Trust Deed (i.e., Castaic I) and the Castaic II Trust Deed.  Since

4    acquiring the Castaic Loans, DACA made the determination that the Castaic III property was worth

5    substantially less than the delinquent real property taxes, that the topography was not conducive to

6    development, and that the Castaic III property was not necessary for the development of the other

7    two parcels.  Accordingly, DACA made the decision not to proceed with the foreclosure as to the

8    Castaic III Loan.  (Justus Decl. p. 7 ll. 5-10)

9        The trustees under the Tapia Ranch Trust Deed and the Castaic II trust deed were subjected

10   to threats of litigation made by counsel for Barkett and refused to act to complete the foreclosures.

11   DACA-Castaic, LLC was required to substitute itself in as the foreclosure trustee and to cause a

12   Notice of Trustee's Sale to be recorded, mailed, posted and published.  (Justus Decl. ¶¶ 20-21 p. 7)

13       The foreclosure sale was originally scheduled to take place on July 31, 2012.  It was delayed

14   when Castaic Partners, LLC and Castaic Partners II, LLC filed bankruptcy petitions.  The United

15   States Bankruptcy Court for the Central District of California entered orders granting relief from the

16   automatic stay in both cases, and the foreclosure sales under the Tapia Ranch Trust Deed and the

17   Castaic II Trust Deed were ultimately completed in November, 2012.  At both foreclosure sales,

18   DACA-Castaic LLC entered a successful credit bid.  Shortly after the sales were completed, DACA-

19   Castaic, LLC, in its capacity as trustee under the Tapia Ranch Trust Deed and the Castaic II Trust

20   Deed, issued a Trustee's Deed Upon Sale transferring title to DACA-Castaic, LLC.  (Justus Decl. ¶¶

21   25-26, p. 8, Exhs 107, 108)

22       Section 3.2 of the Purchase Agreement *(Exh 40 p. 3) obligated DACA V to lend up to $ 3.2

23   Million to the joint venture to pay delinquent property taxes.  DACA ultimately advanced

24   $3,385,147.00  to pay property taxes as to the Tapia Ranch and Castaic II Properties, thus removing

25   the threat of an imminent tax sale.  (Justus Decl. ¶27 p.9)  The terms of the loan from DACA V are

26   set out in the Purchase Agreement.  The money was loaned at 5% interest and requires no payment

27   until maturity, on December 30, 2016.

28

4

G.      DACA'S SUPPLEMENTAL COUNTERCLAIM AND 4TH PARTY COMPLAINT

On December 31, 2012, after the foreclosure was completed, DACA filed a motion (D.I. 208) seeking leave to file a supplemental counterclaim alleging completion of the foreclosure and seeking declaratory relief that the foreclosure was valid.  DACA also sought leave to implead three additional parties affiliated with Barkett which were claimed to have acquired Castaic Direct Lender interests (Pond Avenue Partners, Merjan Financial and Palisades Capital).  DACA's Fourth Party complaint sought to determine whether those entities had acquired Direct Lender interests and also sought declaratory relief as to the validity of the foreclosures.  On March 11, 2013, the Court entered its Order (D.I. 223) granting leave to file the supplemental counterclaim and fourth party complaint, subject to certain conditions stated at pages 7-8 of the Order:

> The Court grants the motion in part, with two conditions. First, the Court will permit those supplemental claims relating to the foreclosure, but not those relating purely to interpretations of Chapter 645 and Cross FLS' authority.  To the extent these issues have not already been litigated, their collateral determination in deciding the foreclosure issues do not make declarations on those points themselves supplemental.  The Chapter 645 issues have been long pled and litigated. Nor need the Court issue declarations on the pure legal status of the deeds of trust.  Broad declarations concerning priorities and such may be outside the scope of determining the true supplemental issues, i.e., the foreclosures. It is enough for DACA to ask the Court to adjudicate the validity of the foreclosures. The Court will address any necessary collateral issues along the way. The Court also warns that it will not issue in rem or quasi in rem judgments as to real property sited in California, but only in personam judgments as to the parties in this case. In other words, the Court will declare the rights of the parties as against one another but will not enter what amounts to a quiet title decree as against the properties. Second, for ease of the Court and the litigants, the Court will require DACA to consolidate its supplemental claims with its existing claims and its answer.

On March 25, 2013 DACA filed its consolidated pleading (D.I. 231).  In conformity with the Order, the original answer and counterclaim were not substantively changed.  The Fourth Party Complaint was changed from the pleading first proposed by DACA, in order to eliminate all prayers for declaratory relief other than a request to adjudicate the validity of the foreclosure.  The Fourth Party Complaint contains only prayers for declaratory relief and not for damages.

H.      DEFAULT IS ENTERED AGAINST THE BARKETT PARTIES

On June 25, 2012, the Nevada firm of Jolley Urga Wirth Woodbury & Standish filed a motion (D.I. 193) to withdraw as counsel for the Barkett Parties, on the grounds of nonpayment of

1    fees.  On July 16, Magistrate Foley entered an Order granting the motion (D.I. 196).  The Order

2    provided that the Barkett Parties would have until August 6, 2012 to associate new local counsel.

3          On August 15, 2012, Magistrate Foley entered an Order (D.I. 201) directing the Barkett

4    Parties to show cause no later than August 27 why they should not be sanctioned for failing to

5    designate local counsel.  On August 27, California counsel for the Barkett parties, having still failed

6    to designate local counsel, filed a pleading (D.I. 201) asking for more time to do so.

7          On August 28, 2012, Magistrate Foley granted the request and entered an order (D.I 203)

8    extending the time for the Barkett Parties to obtain local counsel until October 29.  That date came

9    and went, but the Barkett Parties still failed to designate local counsel or otherwise respond to the

10   August 28 Order.  On November 19, Magistrate Foley entered his "Findings and Recommendation"

11   (D.I. 205) recommending that the answers of the Barkett Parties be stricken.  The Findings and

12   Recommendation states in part:

13        Pursuant to Local Rule IB 3-2, any objection to this Finding and
          Recommendation must be in writing and filed with the Clerk of the Court
14        within fourteen (14) days. The Supreme Court has held that the courts of
          appeal may determine that an appeal has been waived due to the failure to file
15        objections within the specified time. *Thomas v. Arn,* 474 U.S. 140, 142
          (1985). This circuit has also held that (1) failure to file objections within the
16        specified time and (2) failure to properly address and brief the objectionable
          issues waives the right to appeal the District Court's order and/or appeal
17        factual issues from the order of the District Court.  *Martinez v. Ylsi,* 951 F .2d
          1153, 1157 (9th Cir. 1991 ); *Britt v. Simi Valley United Sch. Dist.,* 708 F.2d
18        452,454 (9th Cir. 1983).

19         On December 6 (seventeen days after the date specified by Magistrate Foley) California

20   counsel for the Barkett parties filed an objection to the Findings and Recommendation.  The Barkett

21   Parties still failed to designate local counsel, until finally doing so on January 22, 2013.

22         On March 14, 2013, this Court entered an Order (D.I. 224) adopting the Magistrate's

23   Findings and Recommendation, and striking the answers of the Barkett Parties.  Default was entered

24   by the Clerk on that same date (D.I. 225).  Six months have since passed, and the Barkett Parties

25   have not sought relief from the default.

26   / / /

27   / / /

28   / / /

6

1    On April 19, while still in default, the Barkett Parties filed a document titled "Answer and

2    Counterclaims of Third Party Defendants . . . ." (D.I. 247).  On May 13, 2013, DACA filed a motion

3    to strike these pleadings (except as they related to the matters alleged in the Supplemental

4    Counterclaim).  That Motion is still pending before this Court and has not yet been argued.

5        I.    DACA REPEATS THE FORECLOSURES

6    In their response to DACA's Supplemental Counterclaim, the Barkett Parties alleged that

7    DACA's foreclosure of the Tapia Ranch and Castaic II Trust Deeds was procedurally flawed,

8    because DACA-Castaic was allegedly required to comply with California Civil Code section 2941.9,

9    which imposes some additional procedural requirements applicable to trust deeds with more than

10    one beneficiary of record.  Specifically, section 2941.9 requires that prior to recording a substitution

11    of trustee and proceeding with a notice of trustee's sale, the beneficiaries are required to execute a

12    "majority action affidavit" indicating that the substitution was authorized by a majority in interest of

13    the beneficiaries, and then to serve that document by certified mail on all of the beneficiaries.  The

14    majority action affidavit must then be recorded before the substitution of trustee may be recorded

15    and the notice of sale served by the substitute trustee.

16    As explained below, DACA contends that it is the sole beneficiary of record as to the Tapia

17    Ranch and Castaic II Trust Deeds, and that California Civil Code section 2941.9 does not apply.

18    Nevertheless, in an abundance of caution, in July, 2013 DACA executed a majority action affidavit,

19    re-executed the substitutions of trustee, repeated all  of the foreclosure procedures, holding new

20    trustee's sales on July 25, 2013.  Again, DACA acquired the Tapia Ranch and Castaic II properties

21    at these repeat trustee's sales.  (Justus Decl. ¶¶ 29-30. pp. 9-10, Exhs 140- 143, 164, 167)

22
      J.    THIS MOTION SEEKS FINAL JUDGMENT ON
23            ALL CLAIMS TO WHICH DACA IS A PARTY

24    DACA's Counterclaim against the Barkett Parties alleged two claims for relief:  First, the

25    Counterclaim sought declaratory relief as to thirteen issues in dispute between DACA and the

26    Barkett Parties.  The Court adjudicated most of these issues in DACA's favor, but denied the motion

27    as to some issues.  The 3/14/12 Order does not state that the Court declined to decide any of the

28    disputed issues due to the existence of material disputed issue of fact.   Instead, declaratory relief as

7

1   to one issue was denied as a matter of law.  The Purchase Agreement provides that the claims under

2   the guaranties were not to be assigned to DACA-Castaic, LLC, but remained with the Direct

3   Lenders.  However, the Court ruled that regardless of any provisions of the Purchase Agreement,

4   rights under the guaranties were not severable and followed the assignment of the notes and trust

5   deeds.  DACA, however, has not sued on the guaranties and does not wish to amend its complaint to

6   do so.  DACA proposes instead to include in the Judgment a determination that DACA is the real

7   party in interest as to claims on the guaranty stated by certain Direct Lenders (those voting in favor

8   of the Purchase Agreement) in their Complaint in Intervention.

9          In its 3/14/12 Order, the Court declined to rule on the remaining issues raised in DACA's

10  Counterclaim because they constituted hypothetical matters, or did not constitute a controversy

11  between DACA and the Barkett Parties.  DACA has determined not to seek declaratory relief as to

12  the remaining issues which the Court declined to decide, with one exception.  The Order states in

13  part that "the Court will not attempt to calculate the amounts owing under the notes, but it will

14  require proof of this at trial."  (Order ent. 3/14/12 p. 9 ll. 16-17).  Now that the Barkett Parties'

15  defaults have been entered, DACA is proceeding to prove up the issue of the amount owing on the

16  Notes by submitting the Declaration of Alan Myers, a certified public accountant, showing

17  calculations based upon the terms of the Notes and upon interrogatory answers by the Barkett Parties

18  stating the date and amount of each payment.  Determination of the amounts owing on each Note is

19  necessary in order to confirm that the amounts stated in the foreclosure notices constituted good

20  faith estimates as required by California statute.

21         The second claim for relief stated in DACA's Counterclaim is for the appointment of a

22  receiver.  DACA requests that this claim for relief be dismissed without prejudice

23         DACA's Supplemental Counterclaim and Fourth Party Complaint seek declaratory relief as

24  to two points:  (i) the validity of the foreclosures; and (ii) whether the Barkett Parties held any Direct

25  Lender interests in the Castaic Loans.  DACA presents evidence in support of its Motion that the

26  foreclosures were conducted in compliance with California law, and argues that in any case the

27  Barkett Parties have no right to set aside the foreclosures.  DACA conducted discovery as to whether

28  Barkett and his various entities presently own any Direct Lender interests.  On this point, DACA

1  requests summary judgment in the form of declaratory relief that none of the Barkett Parties have

2  any such interests.

3      Finally, DACA seeks summary judgment denying all relief as to the Barkett Parties' Third

4  Party Complaint and purported "Counterclaim and Fifth Party Complaint."

5  II.    REQUEST FOR ENTRY OF DEFAULT JUDGMENT ON DACA'S COUNTERCLAIM

6      A.    ISSUES ALREADY SUMMARILY ADJUDICATED

7      The First Claim for Relief alleged in DACA's Counterclaim sought only declaratory relief as

8  to thirteen specific points.  There remains only the Second Claim for Relief, seeking appointment of

9  a receiver, and DACA has requested in its Motion that this latter claim be dismissed without

10 prejudice.

11     As mentioned above, in its 3/14/12 Order (D.I. 170) the Court summarily adjudicated certain

12 of those thirteen issues in favor of DACA.  DACA has attached to and incorporated into its Proposed

13 Judgment specific declaratory relief which tracks each of those matters previously determined by the

14 Court.  What follows are references to each section of the Proposed Judgment and cross-references

15 to those portions of the 3/14/12 Order which support those sections.

16     1.    Enforceability of the Notes

17     The 3/14/12 Order states in relevant part at page 9 lines 15-18:

18         [*I*]*it is clear that the Castaic loans are in default. No party appears to
           *dispute this. The Court will not attempt to calculate the amounts owing on*
19         *each loan, but it will require proof of this at trial. Also, the court rules that*
           *the notes were neither usurious nor subject to offset,. . . .*

20     The Proposed Judgment sections 2.1 through 2.5 state:

21

22         2.1 The [Tapia Ranch Loan] . . . . is in default.  The amount owing
           under the Castaic II Note, after deducting the credit bid of $500,000.00 made
23         at the foreclosure sale is $23,801,458.04  as of November 1, 2013 and shall
           increase by an additional $13,223.03  per diem thereafter until the date of
24         entry of this Judgment.

25         2.2    The Tapia Ranch Note is to be interpreted and enforced under
           Nevada law and is valid and enforceable according to its terms.

26         2.3    The [Castaic II Loan] . . .  is in default.  The amount owing
           under the Castaic II Note, after deducting the credit bid of $500,000.00 made
27         at the foreclosure sale is $23,801,458.04  as of November 1, 2013 and shall
           increase by an additional $13,223.03  per diem thereafter until the date of
28         entry of this Judgment.

9

1

2.4     The Castaic II Note is to be interpreted and enforced under Nevada law and is valid and enforceable according to its terms.

2

3

2.5     The [Castaic III Loan] . . . is in default.  The amount owing under the Castaic III Note is $ 21,004,165.34 as of November 1, 2013 and shall increase by an additional $11,668.98 per diem thereafter until the date of entry of this Judgment.

4

5     In its 3/14/12 Order, the Court declined to summarily adjudicate the amount owing under the

6     Castaic Notes.  Since that time, however, the answer of the Barkett Parties has been stricken and

7     their defaults entered.  As far as DACA's Counterclaim is concerned, this Motion is one for entry of

8     default judgment, not summary judgment, and it is appropriate at this time for the Court to

9     determine, based on evidence submitted by DACA, the amounts owing under the Notes.  The

10    evidence submitted on computation of the exact amounts owing is discussed in section III C. below.

11            2.     <u>Enforceability of the Trust Deeds</u>

12    The 3/14/12 Order states in relevant part at page 9 lines 19-20:

13

***The Court rules that the deeds of trust are enforceable under their terms via nonjudicial foreclosure proceedings in California . . . .***

14

15    The Proposed Judgment sections 2.6 through 2.8 state:

16

2.6     Until completion of the foreclosure sale referred to below, the Tapia Ranch Trust Deed was a lien on the property described therein which secured all obligations owing under the Tapia Ranch Note, and the Tapia Ranch Trust Deed was valid and enforceable according to its terms.

17

18

2.7     Until completion of the foreclosure sale referred to below, the Castaic II Trust Deed was a lien on the property described therein which secured all obligations owing under the Castaic II Note, and the Castaic II Trust Deed was valid and enforceable according to its terms.

19

20

21

2.8     The Castaic III Trust Deed is a lien on the property described therein which secures all obligations owing under the Castaic III Note, and the Castaic III Trust Deed is valid and enforceable according to its terms.

22

23            3.     <u>Validity of the Purchase Agreement</u>.

24    The 3/14/12 Order states in relevant part at page 10 lines 1-4:

25

***[T]he Court rules that the Purchase Agreement was approved by majority interests in the loans in compliance with Chapter 645B, that Cross was authorized to perform under the Purchase Agreement, and that under Chapter 645B, Cross's actions under the Purchase Agreement were legitimate***.

26

27

28    The Proposed Judgment sections 2.9 through 12.12 state:

10

2.9     A majority in interest of the beneficiaries of the Tapia Ranch Trust Deed (the "Tapia Ranch Direct Lenders") voted to authorize Cross FLS, LLC ("Cross") to enter into the "Agreement to Purchase Loan Interests" with DACA dated as of March 7, 2011 (the "Purchase Agreement").

2.10    A majority in interest of the beneficiaries of the Castaic II Loan (the "Castaic II Direct Lenders") voted to authorize Cross to enter into the Purchase Agreement.

2.11    A majority in interest of the beneficiaries of the Castaic III Loan (the "Castaic III Direct Lenders") voted to authorize Cross to enter into the Purchase Agreement.

2.12    Cross was duly and legally authorized pursuant to NRS ch. 645B to execute the Purchase Agreement and the Exhibits thereto, and is and continues to be duly and legally authorized to execute all subsidiary documents and take all actions necessary to carry out the intent of the Purchase Agreement.

4.     Validity of the Pending Foreclosures

The 3/14/12 Order states in relevant part at page 9, lines 20-21:

> ***The Court rules that . . . .the pending foreclosures based upon the October 2007 notices of default against the Castaic properties are proper.***

The Proposed Judgment sections 2.16 and 2.17 state:

2.16    That certain Notice of Default and Election to Sell Under Deed of Trust, recorded October 23, 2007 as Document No. 2007-2398356 (the "Tapia Ranch NOD") was duly and properly authorized, recorded and mailed as required under California law, and valid nonjudicial foreclosure proceedings under the Tapia Ranch Trust Deed were thereby commenced. Such foreclosure proceedings were subject to continuation at a later time by the recording, posting, publication and mailing of a Notice of Trustee's Sale.

2.17    That certain "Notice of Default and Election to Sell Under Deed of Trust" recorded October 15, 2007 as Document No. 2007-2398358 (the "Castaic II NOD") was duly and properly authorized, recorded and mailed as required under California law, and valid nonjudicial foreclosure proceedings under the Castaic II Trust Deed were thereby commenced. Such foreclosure proceedings were subject to continuation at a later time by the recording, posting, publication and mailing of a Notice of Trustee's Sale.

B.     REQUEST TO RECONSIDER OR CLARIFY RULING ON THE EFFECT OF THE ASSIGNMENT OF THE CASTAIC TRUST DEEDS BY CROSS

The 3/14/12 Order addressed the effect of the Purchase Agreement, and of the trust deed assignments executed by Cross pursuant to the Purchase Agreement, on those Direct Lenders, constituting a minority in interest, who voted against the Purchase Agreement or who did not vote. The 3/14/12 Order states in part at page 10 lines 5-10:

11

*Although the majority could not transfer the minority's interest involuntarily, it could elect to transfer its own interests, to service the loan, to foreclose, or to otherwise manage the loan without the permission of minority interests.*

*Next, the Court rules that a majority interest in the Castaic loans were validly assigned to DACA-Castaic, LLC and that DACA-Castaic's decision to foreclose on the Castaic properties was therefore also valid.*

These rulings, which DACA believes were intended as a shield to clarify and protect the rights of the minority Direct Lenders, have been grasped by the Barkett Parties as a sword to challenge the validity of the foreclosures and to deny the rights of DACA-Castaic, as the assignee of record of the trustees, to deal with the property post-foreclosure.

In connection with its request for entry of default judgment, DACA requests that the Court reconsider, or in the alternative clarify, its rulings as to the effect of the assignments executed by Cross.

     1.     The 3/14/12 Ruling on the Effect of the Assignments Appears Inconsistent With Prior and Subsequent Orders Approving Note Sales Based on the 51% Rule.

When DACA and Cross negotiated the Purchase Agreement, they both believed that they were following a path authorized under N.R.S. section 645(B) and used before when similar agreements were entered into and approved. The Purchase Agreement is dated as of March 7, 2011, and the transaction closed by recording the assignments on April 26, 2011 (Exhs 69, 70, 71). Long before that, this Court had approved a sale of a note and trust deed under the 51% Rule, in the context of the Asset Resolution bankruptcy case.

***This Court Approved the Harbor Georgetown Note Sale Based on a 55.63% Vote.*** On March 26, 2010, the Asset Resolution bankruptcy trustee filed an emergency motion to sell the Harbor Georgetown Loan. (Exh 170) Direct Lenders in Harbor Georgetown were beneficiaries of two trust deeds. A first trust deed secured an $8,000,000 loan. A second trust deed secured a profit participation agreement. The sale provided for the first trust deed to be assigned to a buyer, Value Ann Arbor Management, LLC, for a purchase price of about $2.5 Million. The sale also required cancellation of the second trust deed securing the Direct Lender's right to receive a profit participation. Asset Resolution held a 5% interest in the Harbor Georgetown Loan.

1       On April 2, 2010, the Court entered an order in the Asset Resolution case (Exh 171) stating

2 that the Court authorized and approved "the sale of the Note and First Mortgage by Cross to Value"

3 and the termination of the Profit Participation Agreement and second mortgage "subject to Cross

4 providing satisfactory evidence it has obtained the consent of 51% or more of the holders.  To

5 comply with this requirement, the Trustee submitted the Declaration of Carol Kesler certifying that

6 the Direct Lenders had voted 55.63% in favor of the proposal.  (Exh 173).  The Court then entered a

7 second Order (Exh 174) finding that more than 51% of the Direct Lenders had voted in favor of the

8 sale.

9       ***This Court Approved the Comvest Note Sale Based on a 51.52% Vote.***  On April 20, 2012,

10 shortly after the Court issued its 3/14/12 Order in the McKnight Action, the Asset Resolution

11 bankruptcy trustee filed an "Ex Parte Application For Authorization to Facilitate Sale of Loan

12 Documents, Including Sale of Estate's Interest" in relation to the Comvest Loan (Exh 175).

13 Comvest was a $4,125,000.00 loan secured by a deed of trust on Florida real property.  Cross had

14 negotiated an agreement to sell the loan for a purchase price of $518,500.00.  Attached to the motion

15 was the Declaration of Carol Kesler, certifying that 51.52% of the Direct Lenders had approved the

16 sale.

17       The Declaration of McAlan Duncan filed in support of the Motion (Exh 176) attaches the

18 loan sale documents, which include a "transfer of note and lien" prepared for execution by Cross as

19 follows:

20         NOTEHOLDER:

21         CROSS FLS, LLC,
        A Texas limited liability company, as agent for the parties who are specified
22         on Schedule I, pursuant to the Majority Administration and Cooperation
        Agreement and other Power of Attorneys executed by more than 51% of the
23         direct lenders set forth on Schedule I.

24 In the case of Castaic, Cross executed the Purchase Agreement and related documents in a similar

25 fashion, on behalf of all of the Direct Lenders.

26 / / /

27 / / /

28 / /

On May 3, 2012, this Court entered its Order approving the Comvest transaction (Exh 173) , which included the following finding:

> 1.   The Loan Documents as described in the application and consummation of the sale described therein has been approved by the holders of more than 51% of the beneficial interest in the Comvest loan and such sale is in the best interest of the debtors and the debtors' estates, and their creditors and parties-in-interest.

The Harbor Georgetown and Comvest note sales were both an outright sale of a note and trust deed made on the authority of a majority vote of Direct Lender interests.  The evidence submitted by DACA in its first summary judgment motion, which was the basis for the Court's ruling that the Purchase Agreement was valid, was even more extensive than the showing made on those two motions.  Itincluded evidence concerning the solicitation of acceptances and even copies of the ballots were included.  Like the other two motions, DACA's motion was supported by declarations of McAlan Duncan on behalf of Cross, and Carol Kesler certifying the results of the vote.

The Purchase Agreement between DACA and Cross, acting on behalf of all of the Direct Lenders, was not unique.  This Court has approved similar transactions under the authority of NRS §645B.340.

### 2.   Note Sales Are Authorized Under the 51% Rule.

NRS §645B.340  provides in relevant part:

> Except as otherwise provided by law or by agreement between the parties and regardless of the date the interests were created, if the beneficial interest in a loan belongs to more than one natural person, the holders of 51 percent or more of the outstanding principal balance may act on behalf of all the holders of the beneficial interests of record on matters which require the action of the holders of the beneficial interests in the loan, including, without limitation:

> (a) The designation of a mortgage broker or mortgage agent, servicing agent or any other person to act on behalf of all the holders of the beneficial interests of record;

> (b) The foreclosure of the property for which the loan was made;
> . . . .

> (c) The sale, encumbrance or lease of real property owned by the holders resulting from a foreclosure or the receipt of a deed in lieu of a foreclosure in full satisfaction of a loan.
> . . . .

14

(e) The modification or restructuring of any term of the loan, deed of trust or other document relating to the loan, including, without limitation, changes to the maturity date, interest rate and the acceptance of payment of less than the full amount of the loan and any accrued interest in full satisfaction of the loan.

The above-quoted provisions of NRS §645B.340 authorize the holders of more than 51% of the beneficial interests in a loan to ***"act on behalf of all the holders of the beneficial interests of record on matters which require the action of the holders of the beneficial interests in the loan, including, <u>without limitation</u> . . . ."*** The assignment of a note and trust deed to a joint venture is a matter which "requires the action of the holders of the beneficial interests in the loan."

The Barkett Parties have argued that to assign the notes and trust deeds to DACA-Castaic, LLC under the Purchase Agreement somehow violates a property right of the non-consenting Direct Lenders, in a more fundamental way than those actions which are specifically mentioned in the statute.  DACA-Castaic submits that the assignment of the Castaic Notes and Trust Deeds to the joint venture is no more "fundamental" an action than is the sale of property post-foreclosure without the consent of all the Direct Lenders, who at that point would be joint tenants holding property rights.  Yet, the post-foreclosure sale of the real property collateral over the objection of non-consenting Direct Lenders is specifically authorized by NRS §645B.340(c).

The authorized actions under NRS §645B.340 are expressly a *non-exclusive* list of examples of things that "require the action of the holders of the beneficial interests in the loan."  The list is expressly "without limitation" to other actions which are authorized under the 51% Rule.  Under the statute, a majority in interest of the Direct Lenders may vote to assign the loan to a joint venture in which all Direct Lenders have an interest.  That is precisely what occurred in this case.

The intent of NRS §645B.340 must have included facilitating the administration and collection of loans in situations exactly like this.  In the case of Tapia Ranch, the vote certified by Carol Kesler showed that 51.78% voted "Yes" but only 2.27% voted "No."  (Kesler Decl. fld 1/6/12, D.I. 142)  The remainder did not vote.  The results in the Harbor Georgetown and Comvest votes were similar.  In all three cases, there were a negligible number of dissenters and larger number of Direct Lenders who made no response whatever.  Some may not be responding because they have

15

1   claimed the investment as a loss on their taxes.   Others may have given up reading the volume of

2   materials sent to them over the many years since the USACM bankruptcy case began.  Others are

3   probably deceased.

4        If it is really correct that the 51% Rule does not allow the assignment of a 100% interest in a

5   fractionated note and trust deed upon a majority vote of the noteholders, these loans would be

6   impossible to administer.  For example, in this case after a foreclosure sale the foreclosure trustee

7   would have been required to issue a Trustee's Deed conveying the property to both DACA-Castaic

8   and about 100 other trust deed beneficiaries of record, almost all of whom had been unresponsive to

9   earlier papers they received.  These individuals presumably did not anticipate, and do not want, to be

10   the co-owners of raw land in Los Angeles County as tenants in common, with the attendant

11   liabilities that go with property ownership.

12        Were DACA-Castaic to be deemed not to be the sole beneficiary of record under the Tapia

13   Ranch and Castaic II trust deeds, and title to these properties were vested of record instead in over

14   100 tenants in common, other actions expressly authorized by NRS §645.340 would be frustrated as

15   well.  The above-quoted statute authorized a majority interest of the co-beneficiaries to encumber

16   property acquired by credit bid at foreclosure.  But what lender could receive title insurance for a

17   deed of trust if the vestees of record were 100 people who would not sign loan documents?

18   Similarly, the statute authorizes a majority in interest to sell property acquired by credit bid at

19   foreclosure.  But in order to pass insurable title to a buyer it would be necessary for the DACA-

20   Castaic as the 51% assignee to file a partition action against its 100 cotenants.

21        It is for these reasons *that the Direct Lenders themselves, in their Complaint in*

22   *Intervention, also asked the Court for declaratory relief to the effect that DACA-Castaic was the*

23   *sole beneficiary under the Castaic Trust Deeds.*  (D.I. 61 pp. 34-35.)

24        For these same reasons, the Court should reconsider its ruling concerning the validity of the

25   assignment as it affects those Direct Lenders who voted "no" or failed to vote.

26   / / /

27   / / /

28   / / /

3.   DACA Acknowledges a Continuing Fiduciary Duty
To All Castaic Direct Lenders.

DACA believes that this Court's previous ruling with respect to the assignment of non-consenting interests may have arisen in part from a mistaken impression, or at least a concern, that the result of the assignment was to divest those Direct Lenders from their share of the proceeds of the Castaic Loans.  The Court may also have been under the misimpression that the intended effect of the Purchase Agreement was to make each Direct Lender, "automatically" a member of Castaic Investors, LLC, the limited liability company formed by Direct Lender Daniel Newman to act as a member of DACA-Castaic, LLC.

In support of its first Motion for Summary Judgment, DACA submitted the Declaration of Mr. Newman (Newman Decl fld 1/6/12, D.I. 143 ¶ 2) which states in part:

> [A]s to any money distributed in the future by DACA-Castaic, LLC to its member Castaic Investors, LLC, Castaic Investors will hold  those funds in trust for, and ***distribute those funds to, all of the Direct Lenders who have an interest in the Castaic Loans, regardless of whether those Direct Lenders actually become members of Castaic Investors, LLC.*** The purpose of Castaic Investors, LLC, is to participate in the DACA-Castaic Joint Venture and ***to distribute the resulting proceeds to the Direct Lenders who hold an interest in any of the Castaic Loans.***

Nothing in the Purchase Agreement says that Direct Lenders will "automatically" become member of DACA-Castaic, LLC or Castaic Investors, LLC.  DACA is fully aware that one cannot become a member of an LLC without signing an operating agreement, and that no one can solicit members of the public to become members of an LLC without complying with any applicable requirements of the securities laws.  It is simply not necessary for any Direct Lender to become a member of any LLC in order to receive a share of proceeds under the Purchase Agreement.

DACA believes that the existence of a trust relationship and fiduciary duty to Direct Lenders, and the preservation of their right to receive a distribution of proceeds, was what the Court intended when it made its 3/14/12 rulings.  DACA-Castaic accepts responsibility for assuring that the proceeds of the Castaic Loans, shared by the Direct Lenders under the terms of the Purchase Agreement, are distributed to all Direct Lenders. To clarify the Court's ruling in that regard, DACA has included the following sections in the Proposed Judgment.

1    2.13    Pursuant to the Assignment of Deed of Trust executed by
     Cross pursuant to the Purchase Agreement, DACA-Castaic, LLC is now the
2    sole beneficiary of record under the Tapia Ranch Trust Deed.

3    2.14    Pursuant to the Assignment of Deed of Trust executed by
     Cross pursuant to the Purchase Agreement, DACA-Castaic, LLC is now the
4    sole beneficiary of record under the Castaic II Trust Deed.

5    2.15    Pursuant to the Assignment of Deed of Trust executed by
     Cross pursuant to the Purchase Agreement, DACA-Castaic, LLC is now the
6    sole beneficiary of record under the Castaic III Trust Deed.
     . . . .
7    2.18    DACA-Castaic, LLC, as the sole beneficiary of record under
     the Tapia Ranch Trust Deed, the Castaic II Trust Deed, and the Castaic III
8    Trust Deed, DACA-Castaic, LLC, retains a fiduciary duty to the Direct
     Lenders to perform the obligations of DACA-Castaic, LLC under the
9    Purchase Agreement and ultimately to distribute the proceeds of the loans to
     the Direct Lenders under the terms provided for under the Purchase
10   Agreement.

11   C.      THE GUARANTIES

12   The Purchase Agreement (Exh 40) provides at article 2 that "The Purchased Assets do not

13   include:  (i) the rights of any Investors under any guaranty of the Tapia/Castaic Loans . . . ."  Article

14   2 concludes by stating:

15       In the event that a determination is made by a court of competent jurisdiction
         that Cross lacks the authority to transfer 100% of the beneficial interests in the
16       Tapia/Castaic Loans, this Agreement and the documents executed and
         delivered pursuant to this Agreement shall still have the effect of transferring
17       the beneficial interests of those Investors who approve this Agreement,
         whether or not such Investors are later found to have constituted a Majority in
18       Interest. ***In the event that a court of competent jurisdiction finds that any
         rights, claims or defenses may not be severed from the Purchased Assets,
19       then such non-severable rights, claims or defenses shall be included in the
         Purchased Assets notwithstanding any other provision of this Agreement***.
20       [*italics* added]

21   This clause was included in the Purchase Agreement to anticipate the Barkett Parties'

22   argument that a promissory note may not be assigned separately from a guaranty of that note.  Later,

23   the Barkett Parties position with respect to the Guaranties was sustained by this Court in its 3/14/12

24   Order.  DACA does not seek to revisit that ruling in this Motion.  If the Court reconsiders or clarifies

25   its ruling on the effect of the Cross assignment on the interests of Direct Lenders not affirmatively

26   voting to approve the Purchase Agreement, it may also wish to determine to what extent the

27   guaranty rights of non-consenting Direct Lenders have also been assigned to DACA.  The Purchase

28

1    Agreement approved by the Direct Lenders expressly contemplates that DACA would succeed to all

2    of the guaranty interests if the Court so ruled.

3        DACA did not sue on the Guaranties and in fact sought no monetary relief whatsoever in its

4    Counterclaim.  The Direct Lenders sued on the Guaranties in their complaint in intervention.  (D.I.

5    61 p. 32 ll. 4-21).  DACA proposes that any judgment on the Guaranties be rendered on the Direct

6    Lenders' Complaint in Intervention.  It would be the effect of the Court's ruling that DACA would

7    be the real party in interest under that Claim for Relief, and any judgment entered in favor of the

8    Direct Lenders could so reflect.  DACA's Proposed Judgment contains the following section 2.19:

9
10       2.19    Those Direct Lenders who voted to approve the Purchase
         Agreement could not assign their interests in the Castaic Note and Trust
         Deeds and still retain their rights under the guaranties of those loans.
11       Accordingly, DACA is the real party in interest as to those Direct Lender's
         claims on the guaranties, which are the subject of their complaint in
12       intervention.

13       To clarify, DACA disagrees with the Court's ruling on this point but obviously must include

14   that ruling in the Proposed Judgment.

15       D.       AMOUNT OWING ON THE CASTAIC NOTES

16       As mentioned above, the Court declined in its 3/14/12 Order to summarily adjudicate the

17   amount owing on the three Castaic Notes.  Since then, defaults have been taken against the Barkett

18   Parties on DACA's Counterclaim, and the amount owing under the Castaic Notes can be established

19   via a default prove up.

20       The balance of the Castaic Notes is relevant to DACA's claims for two purposes.  First, as

21   explained below, it is necessary to determine the approximate balance of the Notes at various times

22   in order to establish the validity of the foreclosure notices, which are required under California Civil

23   Code section 2924f to set forth a "good faith estimate" of the amount secured by the trust deed.

24       Second, the amount currently owing on all three Castaic Notes is relevant to a determination

25   of liability on the Guaranties.  In its 3/14/12 Order, the Court ruled that DACA had succeeded to

26   Guaranty rights of those Direct Lenders who voted in favor of the Purchase Agreement.  Recovery

27   of a deficiency against the Borrowers on the Tapia Ranch and Castaic II Notes may now be legally

28   barred by the completion of a nonjudicial foreclosure of the trust deeds securing those two notes.

19

1   However, the foreclosure does not bar recovery on the Guarantees.  Also, it is expected that the lien

2   of the Castaic III Trust Deed will ultimately be eliminated by a tax sale.  In that case Castaic

3   Partners III, LLC would remain liable on the Castaic III Note and Barkett would continue to be

4   liable on the corresponding Guaranty.

5          In support of its original motion for summary judgment, DACA supported its allegation as to

6   the balance of the Notes exclusively with the Declaration of Howard Justus, who had prepared

7   spreadsheets based on USACM payment summaries which DACA received at the time that it

8   purchased the Castaic Loans.  The mathematics were more complex than most note calculations,

9   since they involved multiple advances,  payments made in irregular amounts on irregular dates, and

10  computation of interest based on a 360 day year with monthly compounding.  DACA later

11  designated Alan Myers, a Certified Public Accountant, as an expert witness with regard to the note

12  calculations, and has submitted his Declaration in support of this Motion.  Also since the original

13  motion was filed, DACA obtained discovery responses from the Barkett Parties (Exhs. 157-162)

14  which list the payments they claim were made on the Tapia Ranch and Castaic II Notes.  These

15  interrogatory responses are consistent with the payment records delivered to DACA (Exhs 72-74).

16  In fact, the schedules used by Mr. Justus in the case of Castaic II actually showed additional

17  payment credits.  All of these payments, even above and beyond those claimed by the Barkett

18  Parties, have been credited by Mr. Myers in computing the balances set forth in the Proposed

19  Judgment.

20
21  III.    SUMMARY JUDGMENT ON DACA'S SUPPLEMENTAL COUNTERCLAIM
        AND FOURTH PARTY COMPLAINT

22          A.    THE VALIDITY OF THE FORECLOSURES

23              The Proposed Judgment sections 3.1 and 3.3 state:

24                  3.1    Nonjudicial foreclosure proceedings under the Tapia Ranch
        Trust Deed were completed in accordance with the requirements of applicable
25      law, and the trustee's sale which occurred on November 13, 2012, as
        evidenced by the "Trustee's Deed Upon Sale" recorded November 15, 2012
26      as Document No. 2012-1733548 (the "Tapia Ranch Trustee's Deed") was
        valid.

27                  . . .
                    3.3    Nonjudicial foreclosure proceedings under the Castaic II
28      Trust Deed were completed in accordance with the requirements of applicable
        law, and the trustee's sale which occurred on November 16, 2012, as

20

evidenced by the "Trustee's Deed Upon Sale" recorded November 20, 2012 as Document No. 2012-1767387 (the "Castaic II Trustee's Deed") was valid.

      1.    <u>The November, 2012 Foreclosure Sales Were Valid</u>

Under California law, a trustee's sale under a deed of trust is subject to a rebuttable presumption of validity. *Stevens v. Plumas Eureka Annex Mining Co.*, 2 Cal.2d 493, 496–497, 41 P.2d 927 (1935); *Wolfe v. Lipsy,* 163 Cal.App.3d 633, 638–639, 209 Cal.Rptr. 801 (1985).

California Civil Code section 2924, subd. (c) states:

> (c) A recital in the deed executed pursuant to the power of sale of compliance with all requirements of law regarding the mailing of copies of notices or the publication of a copy of the notice of default or the personal delivery of the copy of the notice of default or the posting of copies of the notice of sale or the publication of a copy thereof shall constitute prima facie evidence of compliance with these requirements and conclusive evidence thereof in favor of bona fide purchasers and encumbrancers for value and without notice."

"The purchaser at a foreclosure sale takes title by a trustee's deed. If the trustee's deed recites that all statutory notice requirements and procedures required by law for the conduct of the foreclosure have been satisfied, a rebuttable presumption arises that the sale has been conducted regularly and properly; this presumption is conclusive as to a bona fide purchaser. (Civ.Code, § 2924; *Homestead Savings v. Darmiento*, supra, 230 Cal.App.3d at p. 431, 281 Cal.Rptr. 367.)" *Moeller v. Lien,* 25 Cal. App. 4th 822, 831, 30 Cal. Rptr. 2d 777, 783 (1994).

The Trustee's Deeds issued after the November, 2012 foreclosure sales (Exhs 107 and 108) (as well as the later-issued trustee's deeds referred to below,(Exhs 141 & 143) each contain the following recitals:

> Default occurred as set forth in a Notice of Default and Election to Sell which was recorded in the Office of the Recorder of said County, and such default still existed at the time of sale. All requirements of law regarding the mailing of copies of notices or the publication of a copy of the Notice of Default or the personal-delivery of the copy of the Notice of Default and the posting and publication of copies of the Notice of a Sale have been complied with.

> Trustee, in compliance with said Notice of Trustee's Sale and in exercise of its powers under said Deed of Trust, sold the herein described property at public auction . . . .

DACA-Castaic does not claim to be a bona fide purchaser with respect to any claimed irregularities in the foreclosure sale, so the conclusive presumption does not apply. As to the Barkett

1   Parties, however, these recitals still create a rebuttable presumption that all statutory requirements

2   were complied with in connection with the foreclosures.

3          DACA has nevertheless presented further evidence that the trustee's sales were valid.  As set

4   forth in the Justus Declaration filed herewith, threats of litigation by the Barkett Parties made it

5   impossible to obtain an institutional trustee, and as a result, DACA-Castaic was required to

6   substitute itself in as trustee in order to proceed with the foreclosures.  (Justus Decl. ¶ 20p. 7 Exh

7   78).

8          In order to insure that its statutory duties in foreclosing the deed of trust were complied with,

9   DACA retained Foreclosure Resources, Inc., an experienced foreclosure trustee, to assist with the

10  requirements of mailing, publishing and posting the notices, and conducting the sales themselves

11  through an auctioneer.  Foreclosure trustees are expressly authorized to use agents to perform their

12  duties by California Civil Code section 2924d(d), and Foreclosure Resources has acted in that

13  capacity in the past.  (Decl. of Christian Spring filed herewith  ¶¶ 2-4).

14         The requirements for completing a foreclosure, once it has been commenced by Notice of

15  Default, are set forth in California Civil Code section 2924f, which is itself 2423 words long and

16  would occupy four pages if set forth here.  Basically, it requires the recording of a Notice of

17  Trustee's Sale having specified content, and then requires that this Notice:  (i) be sent by certified

18  mail to the owner, junior lienholders and others;  (ii) be published three times in a newspaper of

19  general circulation; (iii) and be posted in a public place as well as in a prominent place on the

20  property itself.  The Declaration of Christian Spring submitted herewith attests that these

21  requirements were satisfied in connection with the foreclosure of the Castaic Trust Deeds.  (Spring

22  Decl. ¶¶ 10- 11.3, pp. 3-4).

23                          2.      No Majority Action Affidavit Was Required,
24                                  or if Required the Defect Was Cured

25         In their responses to discovery and their filings in various courts, the Barkett Parties

26  have contended that the foreclosure of the Castaic Trust Deeds was defective for failure to

27  comply with California Civil Code section 2941.9, which provides in part:

28

(a)     The purpose of this section is to establish a process through which all of the beneficiaries under a trust deed may agree to be governed by beneficiaries holding more than 50 percent of the record beneficial interest of a series of notes secured by the same real property or of undivided interests in a note secured by real property equivalent to a series transaction  . . . .

(d) Any action taken pursuant to the authority granted in this section is not effective unless all the parties agreeing to the action sign, under penalty of perjury, a separate written document entitled "Majority Action Affidavit" stating the following:

(1) The action has been authorized pursuant to this section.

(2) None of the undersigned is a licensed real estate broker or an affiliate of the broker that is the issuer or servicer of the obligation secured by the deed of trust.

(3) The undersigned together hold more than 50 percent of the record beneficial interest of a series of notes secured by the same real property or of undivided interests in a note secured by real property equivalent to a series transaction.

(4) Notice of the action was sent by certified mail, postage prepaid, with return receipt requested, to each holder of an interest in the obligation secured by the deed of trust who has not joined in the execution of the substitution or this document.

This document shall be recorded in the office of the county recorder of each county in which the real property described in the deed of trust is located. Once the document in this subdivision is recorded, it shall constitute conclusive evidence of compliance with the requirements of this subdivision in favor of trustees acting pursuant to this section, substituted trustees acting pursuant to Section 2934a, subsequent assignees of the obligation secured by the deed of trust, and subsequent bona fide purchasers or encumbrancers for value of the real property described therein.

The foreclosures completed under Castaic Trust Deeds in November, 2012 were not subject to the requirements of Civil Code section 2941.9.  First, as subdivision (a) makes clear that the section is intended to provide a procedure for enforcing an ***agreement*** among the beneficiaries to be governed by a 51% vote.  In this case, Nevada law, including NRS § 645B.340, applies, so that the multiple beneficiaries of the Castaic Trust Deeds are bound by the actions of 51% regardless of any agreement.

Second, Civil Code section 2941.9 applies by its terms only to trust deeds having multiple beneficiaries ***of record***.  As set forth in detail above, NRS §645B.340 must be interpreted as permitting 51% of the Direct Lenders to assign the Castaic Trust Deeds of record for the purpose of completing the foreclosures and in encumbering and selling any

23

1   property acquired as a result of the foreclosure.  To hold otherwise would deprive the Direct

2   Lenders of the practical benefits of the statute and create a situation in which the trust deed,

3   and the property after foreclosure, was vested on record in more than 100 tenants in

4   common.

5          If the Barkett Parties were correct in their contention that Civil Code section 2941.9

6   applied to the foreclosures, then any action taken without complying with the statute would

7   be "not effective" as stated in section 2491.9 subd. (d).  In other words, the Substitution of

8   Trustee and Notice of Trustee's Sale would be void.  In an abundance of caution after this

9   objection was raised by the Barkett Parties, DACA-Castaic as to both deeds of trust, to: (i)

10  executed and recorded a Majority Action Affidavit (Exhs 164_& 166);  (ii) executed and

11  recorded a new Substitution of Trustee (Exhs 165 & 167) ; (iii) executed and recorded a new

12  Notice of Trustee's Sale (Exhs 140 & 142); and (iv) proceeded to mail, post and publish the

13  new notices in accord with the requirements of Civil Code section 2924f.  (Spring Decl. ¶¶

14  14-17.3, p. 5)   The sales were held with the same result, and new trustee's deeds were

15  recorded.  (Justus Decl. ¶¶ 28-30 p. 9; Spring Decl. ¶ 18 p. 6; Exhs 141, 143).

16         If, as the Barkett Parties argue, the November, 2012 trustee's sales were void for

17  failure to comply with Civil Code section 2941.9, the second trustee's sale, which did

18  comply, should be held to have been effective.  If that is the Court's ruling, then references to

19  the trustee's deeds in the Proposed Judgment should be revised.

20         B.     NO RIGHT TO SET ASIDE THE FORECLOSURES

21         The Proposed Judgment sections 3.2 and 3.4 state:

22                 3.2     Neither the Barkett Parties nor the Fourth Party Defendants, or
                   any of them, have the right to rescind or set aside the foreclosure of the Tapia
23                 Ranch Trust Deed.

24                 3.4     Neither the Barkett Parties nor the Fourth Party Defendants, or
                   any of them, have the right to rescind or set aside the foreclosure of the
25                 Castaic II Trust Deed.

26         All of the alleged procedural irregularities alleged by the Barkett Parties are obstructive and

27  meaningless because, all else besides, the Tapia Ranch and the Castaic II Properties are grossly

28  overencumbered by the trust deeds.  In support of its first motion for summary judgment, DACA

24

1  submitted the Declaration of Lawrence Wasbin, MAI, who prepared a full narrative appraisal report

2  (Exh 80) concluding that as of May 5, 2011, the value of the Tapia Ranch Property was $3,265,000

3  and the value of the Castaic II Property was $1,550,000.  The Justus Declaration states that after

4  acquiring the Castaic Trust Deeds, DACA-Castaic appealed the assessed value of the Castaic

5  Properties.  The assessments were reduced to (i) Tapia Ranch, $9,342,200 and (ii) Castaic II

6  $1,360,000 effective for the 2011-12 tax year.

7      Mr. Barkett in a declaration filed in the Central District Bankruptcy Court in opposition to

8  DACA's motion for relief from stay (Exh 163)  claimed that the Tapia Ranch Property was worth

9  "not less than $29,505,000.00  and Castaic Partners II $9,400,000 and are likely much higher."

10      The Court is not being asked to determine the value of the Castaic Properties.  This value

11  was not put at issue in any of the pleadings and if it were it would be a disputed fact.  The point here

12  is that no one even **claims** that the Castaic Properties are worth the amount of the liens against them.

13  According to the Myers Declaration, at the time of the November foreclosure sales the debt secured

14  by the Tapia Ranch Trust Deed was $83,486,325.15 and the debt secured by the Castaic II Trust

15  Deed was $20,170,899.39.

16      A claim to rescind or set aside a completed trustee's sale and restore title to the trustor is an

17  action in equity.  *Anderson v Heart Federal Savings & Loan Assn.,* 208 Cal App 3d 202, 209-10,

18  256 Cal.Rptr. 180 (1989).

19          [T]he elements of an equitable cause of action to set aside a foreclosure sale
20      are: (1) the trustee or mortgagee caused an illegal, fraudulent, or willfully
        oppressive sale of real property pursuant to a power of sale in a mortgage or
        deed of trust; (2) the party attacking the sale (usually but not always the
21      trustor or mortgagor) was prejudiced or harmed; and (3) ***in cases where the
        trustor or mortgagor challenges the sale, the trustor or mortgagor tendered
22      the amount of the secured indebtedness or was excused from tendering***.

23          *Lona v. Citibank, N.A.,* 202 Cal. App. 4th 89, 104, 134 Cal. Rptr. 3d 622, 633 (2011).

24      California cases involving claims to set aside a trustee's sale based upon an irregularity in the

25  foreclosure require a tender.  For example, in *MCA, Inc . v. Universal Diversified Enterprises Corp.,*

26  27 Cal.App.3d 170, 177, 103 Cal.Rptr. 522 (1972) the California Court of Appeal dismissed a

27  complaint to set aside a trustee's sale because it did not allege a tender.  The Court stated:

28

25

> [B]ecause we do not find in the record any offer on the part of [defendant] to pay the full amount of the debt for which the property was given as security. Some disposition on the part of [defendant] to do equity by tendering the amount of the debt due is a prerequisite to [a] demand for a judgment cancelling the trustee's sale. (*Py v. Pleitner,* 70 Cal.App.2d 576, 582 [161 P.2d 393], and cases cited . . . .
>
> *MCA, Inc. v. Universal Diversified Enterprises Corp.,* supra, 27 Cal. App. 3d at 177.

"A valid and viable tender of payment of the indebtedness owing is essential to an action to cancel a voidable sale under a deed of trust."  *Karlsen v. Am. Sav. & Loan Assn.,* 15 Cal. App. 3d 112, 117, 92 Cal. Rptr. 851 (1971).  This rule premised upon the equitable maxim that a court of equity will not order a useless act performed."  *Arnolds Management Corp. v. Eischen,* 158 Cal.App.3d  575,  578–579, 205 Cal.Rptr. 15 (1984).

The Barkett Parties have never alleged that they tendered any sum of money to DACA-Castaic in order to avoid completion of the foreclosures.  Instead they have claimed that nothing is owed, relying on theories of usury and offset which this Court rejected in the 3/14/12 Order.  In fact, it would make no economic sense to tender even the principal amount of these loans, made in 2004 through 2006 at the height of the real estate bubble.  Because the Barkett Parties have not tendered the amount secured by the Castaic Trust Deeds, they have no claim to set aside the completed foreclosure sales.

C.      THE BARKETT PARTIES DO NOT HOLD ANY DIRECT LENDER INTERESTS

The Proposed Judgment section 3.5 states:

> 3.5      Neither the Barkett Parties, nor Merjan, nor Palisades own any Direct Lender interest in any of the Castaic Loans.

A request for declaratory relief on this subject was included in the Supplemental Counterclaim and Fourth Party Complaint because the Barkett Parties, after the original Counterclaim was filed, began to allege that they owned interests in the Castaic Loans, acquired from the Direct Lenders.  In his Declaration filed in the Castaic Partners bankruptcy case, Mr. Barkett testified that "Either I or entities of which I am the managing member, including Pond Avenue Partners, have acquired beneficial interest in the Castaic Partners note and deed of trust and in the Castaic II Partners deed of trust. I have also through the Castaic entities taken defaults against

26

1    beneficial owners in the Los Angeles superior court action.  Between the purchases and the defaults,

2    either I or entities that I manage own approximately 50% of the beneficial interest in the notes

3    secured by the deeds of trust." (Exh 163 p. 2 ¶ 3).

4          After obtaining leave to file the Supplemental Counterclaim and Fourth Party Complaint,

5    DACA conducted discovery to determine the basis Barkett's claims.  It came to light that after suing

6    the Direct Lenders in Los Angeles County Superior Court (in violation of the forum selection

7    provisions of the loan documents) Barkett tendered settlement agreements to many Direct Lenders, a

8    few of whom agreed to sell their interests (in one case for as little as $5.00) to (variously) Barkett, to

9    his entity Pond Avenue Partners, to one of the borrowers, etc.  Many of these agreements were later

10    breached due to failure to pay even the agreed upon prices.   In some cases, quitclaim deeds were

11    executed.  In others, Direct Lender interests were assigned.

12          DACA has decided not to seek a judgment against Pond Avenue Partners on this point,

13    simply because there would be many disputed issues of fact, necessitating a trial.  Further, trying to

14    determine whether there was actual performance under the settlement agreements, and the effect of

15    any breach on the assignments and the releases which were part of the settlement agreements, would

16    probably involve the affected Direct Lenders as necessary parties.

17          However, in responses to discovery the Barkett Parties have admitted that neither they, nor

18    their affiliate Merjan Financial, have any interest in the Castaic Loans.  In their Supplemental

19    Response[3]  to Interrogatory No. 5 (obtained only upon order of Magistrate Foley after a motion to

20    compel) each of the Barkett Parties stated:  "Neither Barkett personally, Merjan Financial or the

21    Castaic entities (except by the defaults) hold any Tapia Direct Lender interests."  This answer is

22    made applicable to the Castaic II Loan as well via the answer to Interrogatory No. 9, which states

23    that "all transfers whether involving Tapia, Castaic II or Castaic III are listed in response to

24    Interrogatory No. 5."

25          DACA therefore requests summary judgment on this point as to the Barkett Parties and

26    Merjan Financial, consistent with the above-quoted interrogatory responses.

27

28

---

[3]  The Interrogatories are Exhibits 154-156.  The Supplemental Responses are Exhibits 160-162.

IV.     SUMMARY JUDGMENT ON THE BARKETT PARTIES' CLAIMS

Finally, this is a defensive motion as it relates to the claims of the Barkett Parties against DACA in their original Third Party Complaint (D.I. 156 & 157).  The allegations of the Third Party Complaint against DACA are set forth in section K of that pleading (paragraphs 75 to 90 at pages 16-18).   These allegations relate only to the disputed validity of the assignment of the Castaic Loans to DACA-Castaic.  The claims for relief relating to these allegations are the Second Cause of Action, seeking declaratory relief, and the Seventh Cause of Action (Slander of Title).

If a default judgment is entered on DACA's Counterclaim, finding that the notes and trust deeds were valid and enforceable according to their terms, and that the Purchase Agreement and the assignment executed by Cross were effective and rendered DACA-Castaic the beneficiary of record under the Castaic Trust Deeds, none of the relief sought against DACA-Castaic may be granted.

The Barkett Parties later re-cast these same claims as a "Fifth Party Counterclaim and Complaint."  (D.I. 247 ¶¶ 90-115, pp. 12-17).  In addition to essentially the same request for declaratory relief as to the validity of the assignments, two new claims for relief are stated in that pleading based on "Wrongful Foreclosure" and "Interferences." Again, if a default judgment is entered on DACA's Counterclaim, the Barkett Parties' claims for relief cannot stand.

DACA has filed a motion (D.I. 259)  to strike the "Fifth Party Counterclaim and Complaint" on the grounds that it (i) was filed without leave of court pursuant to Federal Rule of Civil Procedure 15(d); (ii) was filed by parties in default for failure to answer; and (iii) violates this Court's order entered March 11, 2013, limiting the scope of the pleadings.  That motion is still under submission.

V.     CONCLUSION

For the reasons stated above, DACA requests that judgment be entered in the form of the Proposed Judgment attached to the Motion.

DATE:  September 6, 2013                    KIRBY & McGUINN, A P.C.


                                           By:____/s/ Dean T. Kirby, Jr._____
                                           Dean T. Kirby, Jr.
                                           Attorneys for Third Party Defendants
                                           and Counterclaimants and Fourth Party Plaintiffs
                                           DACA-Castaic, LLC and
                                           Debt Acquisition Company of America V, LLC

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28